UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LAVON ANNETTE SEAWOOD,

                              Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.

Case No.: 19-CV-555-LAB(WVG)

**REPORT AND
RECOMMENDATION ON CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

**[Doc. Nos. 17, 18.]**

This is an action for judicial review of a decision by the Acting Commissioner of Social Security, Nancy A. Berryhill, denying Plaintiff Lavon Annette Seawood supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation. For the reasons stated below, the Court RECOMMENDS that Plaintiff's motion for summary judgment be DENIED and Defendant's cross-motion for summary judgment be GRANTED.

/ / /

/ / /

/ / /

1

# I. OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A. The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically-determinable impairment[1] that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both of these requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving that he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds that a claimant is disabled or not disabled at any step in this process,

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

If the ALJ does not deem a claimant disabled—but before formally proceeding to step four—the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must

assess relevant medical and other evidence, as well as consider all of the claimant's impairments, including impairments categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the ability to perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request

review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983.

## II. BACKGROUND

### A. Procedural History

Plaintiff is a 40-year-old woman who alleges to be too disabled to work. (AR 204-07.) On December 22, 2014, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits. (AR 204-07.) She also filed a Title XVI application for supplemental security income on December 22, 2014. (AR 209-16.) In both applications, Plaintiff alleged her disability began on October 1, 2005. (AR 204-16.) On September 9, 2015, the SSA denied these initial applications, (AR 131-38), and the SSA denied her applications for reconsideration on January 27, 2016, (AR 131-46). Plaintiff then requested a hearing before an ALJ, which occurred on February 22, 2018. (AR 33-65.) The ALJ issued an unfavorable decision on April 10, 2018. (AR 12-26.) The Appeals

Council denied Plaintiff's request for review of the unfavorable decision on February 14, 2019. (AR 1.) On March 26, 2019, Plaintiff filed the Complaint in the instant case seeking review of the AJL's decision.

**B. Medical Overview[2]**

At a prison intake screening in January 2013, Plaintiff reported a history of treatment for depression and anxiety, reported she was taking two anti-depressants medications, but she denied any current emotional distress of mental health concerns. (AR 386-88.) On examination, Plaintiff was cooperative and oriented with no indication of mental illness. (AR 387.) A prison psychologist found that Plaintiff was stable and had no noteworthy mental status issues. (AR 386, 388.)

Later that month, Plaintiff met with Salvador Villalon, M.D., at the prison clinic, reporting a seven-year history of depression, treated by sertraline and trazodone. (AR 337.) On examination, Plaintiff was moderately anxious, with increased energy and decreased sleep. (AR 337.) Dr. Villalon observed that Plaintiff was alert and oriented, yet irritable, agitated, and anxious. (AR 338.) He assessed Plaintiff's global assessment of functioning (GAF) at 51 to 70 (AR 339.)[3]

---

[2] Plaintiff made no effort to summarize the medical evidence in the Record. However, Defendant provides an extensively detailed recitation of the medical evidence. The overview in this mirrors Defendant's excellent summary, which has been checked against the Record for accuracy. This Court commends defense counsel for her painstakingly thorough work and for exerting the great effort required to complete this task.

[3] A GAF score is a point-in-time snapshot assessment of an individual's level of functioning, useful in planning treatment. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM–IV) 32-34 (4th ed., 1994). GAF scores include a significant number of non-medical factors, such as financial and legal troubles, which do not constitute work-related functional limitations resulting from medical impairments. DSM-IV at 33. A GAF between 61 and 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34. A GAF between 51 and 60 reflects "[m]oderate symptoms (e.g., depressed mood and mild insomnia) OR

19-CV-555-LAB(WVG)

Plaintiff returned to the clinic in April 2013, complaining of mood instability and insomnia. (AR 329.) On examination, Plaintiff was alert, oriented, cooperative, and anxious, with normal speech, logical thought processes, and no hallucinations, suicidal ideation, or homicidal ideation. (*Id.*) A clinician diagnosed anxiety and depressive disorder, and prescribed trazodone. (AR 330.)

In July 2013, Plaintiff saw Saroj Gulani, M.D., at the prison clinic, reporting a history of depression and stress disorder, treated by sertraline and trazodone, with no side effects. (AR 321.) Plaintiff said she experienced some stress, but exercise helped. (*Id.*) Dr. Gulani observed that Plaintiff appeared well, with normal speech, language, and thought processes. (AR 322.) He diagnosed anxiety and depression, provided refills, and assessed GAF at 51 to 70. (AR 322-23.)

From July through December 2013, Plaintiff visited the prison clinic for allergic reactions, headaches, and indigestion. (AR 298-319.) Clinicians observed that Plaintiff was alert, oriented, cooperative, and well-appearing, although occasionally agitated and anxious. (AR 298-99, 301-02, 305, 311, 313, 317.) GAF remained at 51 to 70. (AR 339, 343.) Plaintiff met with a social worker in October 2013, concerned about what she could do to regain custody of her two children after her release from prison. (AR 383.) The social worker noted that Plaintiff was tearful and upset, yet insightful about her current situation. (*Id.*)

In July 2014, seven months after her last visit to the prison clinic, Plaintiff went to County Behavioral Health, reported a history of abuse and neglect, and requested treatment for anxiety and depression. (AR 408-14, 463-69.) A counselor observed that Plaintiff was oriented, with slowed speech, impaired memory, circumstantial thought process, and irritable, agitated, and depressed mood. (AR 411.) The counselor diagnosed major depressive disorder and prolonged post-traumatic stress disorder (PTSD), and

---

moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV at 34.

19-CV-555-LAB(WVG)

recommended medication and therapy. (AR 411-12, 414.) The clinician's notes also indicate that Plaintiff's symptoms "interfere with meaningful relationships," "interfere with normal requirements for work," and "interfere with regular eating/sleeping pattern." (AR 412.)

Plaintiff went to Clinicas de Salud del Pueblo (Clinicas) later that month for a routine examination. (AR 444.) Plaintiff said she was compliant with her medications, which included Depakote (anti-seizure medication) and olanzapine (an antipsychotic). (*Id.*) She reported symptoms of depression, but denied difficulty with concentration, feelings of guilt, or suicidal ideation. (AR 445.)

In August 2014, Plaintiff went to Pioneers Memorial emergency department, complaining of calf pain. (AR 430.) On examination, Plaintiff was alert, oriented, and cooperative, with a calm affect, coherent speech, and no barriers to learning. (*Id.*) Plaintiff stated that she was not currently taking any medications. (AR 434.) Plaintiff returned to Pioneers Memorial in September 2014, complaining of foot pain. (AR 415.) Clinicians again observed that Plaintiff was alert, oriented, and cooperative, with coherent, appropriate speech and appropriate behavior. (AR 415.) Plaintiff's only medication was noted as Seroquel. (AR 422.)

Plaintiff returned to Clinicas in November 2014 to follow up on her emergency room visit, reporting anxiety, depression, and difficulty with concentration. (AR 457, 459.) On examination, she was oriented, with appropriate mood and affect, and normal insight and judgment. (AR 461.)

In January 2015, Plaintiff told a clinician at Clinicas that she was no longer taking any medication for bipolar because she was "just tired of taking pills." (AR 449.) The clinician noted Plaintiff's "very good insight" into issues related to weight gain, and encouraged Plaintiff to resume mental health treatment. (AR 449.)

Plaintiff met with psychiatrist Alvaro Camacho, M.D., in February 2015, to initiate medication management. (AR 524-28.) Dr. Camacho prescribed Seroquel, Depakote, olanzapine, and assessed GAF at 55. (AR 525-26.) Plaintiff saw Dr. Camacho again in

March, April, and May 2015 for medication refills. (AR 512-23.) GAF remained at 55. (AR 518, 522.)

On May 31, 2015, Plaintiff underwent an orthopedic consultative examination at the request of the Disability Determination Service (DDS), in response to her complaints of disabling back pain following a slip and fall injury in 2004. (AR 484-88.) Payam Mozaaza, M.D., observed that Plaintiff was "very pleasant" and noted no mental findings. (AR 484.)

In June 2015, Plaintiff went to the Pioneers Memorial clinic, complaining of swelling in her legs. (AR 538.) On examination, Plaintiff was pleasant, well-appearing, and in no apparent distress. (AR 539, 547.) Mental status findings showed that Plaintiff was alert and oriented, with a calm affect and coherent speech. (AR 538-39, 542.) Plaintiff also met with Dr. Camacho that month for medication refills. (AR 508-11.)

Plaintiff returned to Pioneers Memorial clinic in July 2015, complaining of flank pain. (AR 528-36.) Clinicians observed that Plaintiff was awake, alert, oriented, and cooperative, with a calm, appropriate affect and coherent speech. (AR 528, 536.) Plaintiff also saw Dr. Camacho that month for medication refills. (AR 504-07.) GAF was assessed at 45. (AR 506.)

Plaintiff saw Dr. Camacho in August 2015 for medication refills. (AR 500-03.) Dr. Camacho made no findings on examination, and assessed GAF at 50. (AR 502.) Plaintiff returned to Clinicas later that month to address anemia and back pain. (AR 494-99, 555-60.) On examination, Plaintiff was oriented, with appropriate mood and affect, and normal insight, judgment, and memory. (AR 497, 558.) A review of systems was negative for depression or other psychiatric issues. (AR 557.)

On September 9, 2015, after reviewing the evidence of record, state agency physician N. Haroun, M.D., found no severe mental impairments. (AR 76, 88, 90.) Dr. Haroun noted that his exam showed mild depression and "no more than mild functional limitations." (AR 90.)

In January 2016, Plaintiff went to Clinicas for counseling and medication management. (AR 566-75.) Findings on mental status examination were "generally

normal," with normal appearance and activity, cooperative attitude, and average eye contact. (AR 570.) Plaintiff had a euthymic mood and full affect, with rapid, pressured speech, tangential thought process, and normal perception. (AR 570-71.) Treatment notes indicate that Plaintiff had moderately impaired judgment (AR 571), but also indicate she had good insight and judgment, and was making good progress (AR 573). Dr. Camacho provided medication refills (AR 566) and assessed GAF at 50 (AR 572). Plaintiff went to Clinicas on two other occasions in January 2016 with no complaints and no noted symptoms of anxiety or depression. (AR 562-65, 576.)

On January 27, 2016, after reviewing the evidence of record, including treatment records from Dr. Camacho and the consultative examination report, Tawnya Brode, Psy.D., found that Plaintiff had mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, persistence, or pace, due to affective and anxiety-related disorders. (AR 104-05, 115-17.) The doctor opined that Plaintiff was not significantly limited in understanding, remembering, and carrying out simple instructions; maintaining concentration and attention over extended periods for simple tasks; sustaining appropriate interaction in a limited public context; and responding appropriately to most changes in the work setting. (AR 109-10.) The doctor opined Plaintiff was moderately limited in interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially-appropriate behavior; adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the workplace; carrying out detailed instructions; remembering, understanding, and carrying out detailed instructions; maintaining attention and concentration for extended periods; ability to work around others without being distracted by them; and completing a normal workday or workweek without interruptions from her psychologically-based symptoms. (*Id.*)

Plaintiff saw Dr. Camacho for medication management in February 2016. (AR 585-95.) Mental status findings were "unremarkable." (AR 588.) Plaintiff had a euthymic mood, full affect, clear speech, logical thought process, average intelligence and insight,

and normal cognition, perception, and judgment. (AR 588, 590-91.) Dr. Camacho observed that Plaintiff had made "good progress" and was "very stable" on her medication regimen, and her anxiety was under control, with no manic or disruptive behaviors. (AR 590, 593.) Dr. Camacho provided medication refills (AR 587) and assessed GAF at 55 (AR 587, 592).

Plaintiff went to Clinicas in March 2016, complaining of back and knee pain. (AR 598.) On examination, Plaintiff was oriented, with appropriate mood and affect and normal memory. (AR 600.) She returned to Clinicas in April and May 2016, complaining of back pain. (AR 603-10.) On examination, Plaintiff was oriented, with appropriate mood and affect and no abnormalities in mental status. (AR 610.)

In July 2016, Plaintiff told Dr. Camacho that she was doing okay but she had run out of medication and missed an appointment due to ongoing issues with child support. (AR 622.) Findings on mental status examination were "generally normal," with normal appearance, cooperative attitude, and average eye contact. (AR 622.) Plaintiff had a depressed mood, with full affect, clear speech, logical thought process, and normal to good perception, insight, and judgment. (AR 622-23, 625.) Plaintiff was making "good progress." (AR 625.) Dr. Camacho provided medication refills (AR 618-19) and assessed GAF at 55 (AR 620, 624). Plaintiff also went to Clinicas that month and the next, reporting back pain. (AR 612-17, 630.) On examination, Plaintiff was oriented, with appropriate mood and affect and normal memory. (AR 615, 632.)

Plaintiff saw Dr. Camacho two months later, in September 2016, complaining of stress, anger, and depression due to ongoing issues with her ex-husband. (AR 635-44.) She denied any psychosis or impulsive behavior. (AR 639.) General observations on mental status examination were within normal limits, other than Plaintiff's anxious attitude. (*Id.*) Plaintiff had a depressed, anxious mood with full affect, clear speech, normal perception, and racing thought process. (AR 639.) Her insight was normal, but her judgment was mildly impaired. (*Id.*) Treatment notes also indicate that Plaintiff's insight and judgment were "good," and she was making good progress. (AR 642.) Dr. Camacho continued

Plaintiff's medications and adjusted her dosage of Depakote secondary to mood lability. (AR 636, 643.)

During October 2016, Plaintiff twice met with Allyson Kellum, L.C.S.W., at Clinicas. The first meeting was for counseling intake upon referral from Dr. Camacho. (AR 645-54.) Plaintiff told Ms. Kellum that she had a high school education and vocational training, but she did not want to work, was not looking for work, and did not want any assistance finding employment or furthering her education. (AR 647.) She just wanted to resolve custody issues and be more stable on medications. (AR 648.) Plaintiff said she was living with her mother and two children, and she had an excellent relationship with her children and fair relationship with her mother. (AR 646.) She claimed to enjoy cooking, listening to music, tending to her children, and said her mother and children were her primary social supports. (*Id.*) On examination, Plaintiff was neatly dressed and well groomed, with normal speech, intact thought process, and good eye contact. (AR 648.) She complained of severe depression and anxiety, reporting stressors related to her children's father and difficulty complying with psychotropic medications. (*Id.*) The clinician thought Plaintiff would benefit from counseling services. (*Id.*) Plaintiff saw Ms. Kellum for a counseling session later that month. (AR 655-62.) Treatment notes do not include mental status findings or a summary of topics discussed. GAF was 55. (AR 657.)

Plaintiff returned to Clinicas in October 2016, complaining of back pain. (AR 663-67.) On examination, Plaintiff was oriented, with appropriate mood and affect and normal memory. (AR 665.)

In December 2016, Plaintiff told Dr. Camacho that she had run out of medication and experienced an episode of anger and impulsivity. (AR 675.) She said she had applied for SSI and was unable to keep a job "due to her disruptive impulsive violent [behavior] toward others." (*Id.*) Mental status observations were generally within normal limits, other than an anxious attitude. (*Id.*) On examination, Plaintiff had an angry, irritable mood, with labile affect, pressured speech, and racing thought process. (*Id.*) Insight and judgment were normal. (AR 676.) Dr. Camacho attributed Plaintiff's depression and anxiety to her

noncompliance with medication (AR 675), yet elsewhere he noted that Plaintiff took medications as prescribed (AR 677). Dr. Camacho provided medication refills, instructed Plaintiff to resume medications, and assessed GAF at 55. (AR 673, 677-79.)

Plaintiff saw Dr. Camacho again in January 2017, reporting difficulty interacting with others and sustaining a job, but denying any violent or disruptive behavior. (AR 685.) Plaintiff reported compliance with medications. (*Id.*) Observations on mental status examination were "generally normal." (*Id.*) Plaintiff had a euthymic mood and full affect, with rapid speech, racing thought process, normal perception, and moderately impaired judgment. (AR 685-86.) The doctor noted an episode of hypomania (AR 687), provided medication refills (AR 682), and assigned GAF of 55 (AR 683, 687). He noted that Plaintiff had good insight and judgment and had made good progress. (AR 688.)

Plaintiff saw Dr. Camacho a month later, in February 2017, for medication refills. (AR 691-700.) She reported depression, stress, and diminished concentration due to ongoing court proceedings regarding child custody and alleged child abuse, but she denied any violent impulses or thoughts of hurting herself or others. (AR 695.) On examination, Plaintiff was depressed and anxious, with clear speech, logical thought process, and normal perception, insight, and judgment. (AR 695-96.) Dr. Camacho refilled medications, increasing Plaintiff's dosage of Seroquel (AR 697-99), and noted that Plaintiff had good insight, judgment, and was making good progress. (AR 698.) GAF was 55. (AR 693, 697.)

Four months later, in June 2017, Plaintiff saw Dr. Camacho for refills, again reporting anxiety and depression due to the ongoing custody case, but denying any violence, disruptive behavior, or thoughts of injuring herself or others. (AR 701-06.) On examination, Plaintiff had a depressed, anxious mood with full affect, clear speech, logical thought process, and normal perception, cognition, insight, and judgment. (AR 701-02.) Dr. Camacho diagnosed dipolar disorder in partial remission. (AR 702.) He adjusted Plaintiff's Seroquel dosage due to increased anxiety specifically associated with custody proceedings. (AR 705.) GAF was 50. (AR 702.)

Plaintiff went to Clinicas in July 2017 complaining of back pain. (AR 709-14.) Psychiatric findings on examination were normal, showing normal memory and appropriate mood and affect. (AR 712.)

Plaintiff met with Dr. Camacho in August 2017, reporting mild to moderate stress, specifically due to custody issues. (AR 715-24.) GAF remained at 50. (AR 717.) Plaintiff said she was not sure why she lost custody, but suspected it was related to her imprisonment on money laundering charges. (AR 719.) Plaintiff reported noncompliance with medication, stating that she was having "occasional anger and getting in fights" since she was not taking her medications. (*Id.*) General observations on mental status examination were "generally normal." (*Id.*) Plaintiff showed an angry mood, full affect, rapid speech, racing thoughts, and normal perception and insight and mildly impaired judgment. (AR 719-20.) Dr. Camacho provided refills and referred Plaintiff to psychotherapy. (AR 721-23.)

At a "well-woman" examination later that month, a review of systems and examination were negative for psychiatric issues. (AR 729-30.) Appointments at Clinicas in October and November 2016 showed normal mental status. (AR 736-37, 743-44.)

Plaintiff met with Dr. Camacho in November 2017, reporting that she had been doing "okay" and her symptoms were under control despite her unresolved custody issues. (AR 748, 752.) Plaintiff acknowledged that medication controlled her depression, irritability, and mood lability when taken, but she had mood fluctuations when she did not take medication as prescribed. (AR 752.) Plaintiff said she was spending time at home with her boyfriend and cleaning the house. (*Id.*) On mental status examination, Plaintiff had a euthymic mood, full affect, rapid speech, racing thoughts, normal perception and insight, and mild impairment in judgment. (AR 753.) Dr. Camacho provided refills, noting Plaintiff's good judgment, insight into her symptoms, and progress. (AR 755-56.) GAF was 50. (AR 750, 754.)

Plaintiff went to Clinicas in December 2017 and January 2018 for issues unrelated to mental health. (AR 758-55.) On both occasions, psychiatric findings on examination were normal. (AR 764, 772.)

Dr. Camacho completed a mental function medical source statement (MSS) on February 5, 2018. (AR 781-85.) Dr. Camacho checked boxes indicating maximum limitations in 33 of the 34 areas evaluated, opining extreme limitations in Plaintiff's ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage one's self. (*Id.*) The single exception to extreme findings was in the area of ability to understand, remember, or apply information. (AR 785.) In that domain, Dr. Camacho indicated marked, rather than extreme, limitations. (*Id.*) Dr. Camacho identified a diagnosis of bipolar disorder, with fair prognosis. (AR 781.) He listed Plaintiff's medications as Seroquel, olanzapine, and Neurontin, and stated that medications caused fatigue, dizziness, and occasional sedation. (AR 781.) He checked boxes to indicate that Plaintiff's symptoms made her unable to work as of March 2014, and she would be unable to perform tasks for 20 percent of more of the workday in all areas evaluated. (AR 781-83.) He checked boxes to indicate that she would be off task more than 30 percent of the workday, she would miss more than six days a month, and she would be unable to complete an eight-hour workday more than six days a month due to her impairments. (AR 783.) He opined that Plaintiff had average intelligence, but she had problems making decisions due to mood lability and poor anger control, and her anger, impulsive behavior, and problems interacting with others would preclude her from competitive work. (AR 784.) He said he based his opinion on Plaintiff's medical history, file, and office treatment notes. (*Id.*)

## C.    Consultative Examining Expert Evidence

Psychiatrist Ernest Bagner III, M.D., examined Plaintiff on July 25, 2015, at the request of DDS and performed a complete psychiatric evaluation. (AR 489-93.) Plaintiff reported a history of sleep disorder, anxiety, depression, crying, nightmares, and flashbacks, and endorsed difficulty with concentration and memory. (AR 489.) She reported outpatient treatment in 2010 and 2011, but denied any psychiatric hospitalization.

19-CV-555-LAB(WVG)

(AR 489-90.) She reported her current medications as Seroquel, Depakote (divalproex), and olanzapine. (AR 490.) On examination, Plaintiff was tearful yet alert, oriented, cooperative, and had good eye contact. (AR 491.) Her speech was soft, slow, and emotional, and her mood was depressed, with appropriate affect. (AR 491.) She denied hallucinations and showed no evidence of delusions or thought disorder. (AR 491.) Memory, concentration, fund of information, and insight were normal. (AR 491-92.) Dr. Bagner diagnosed bipolar disorder and possible PTSD. (AR 492.) He opined that Plaintiff would be able to follow simple oral and written instructions and comply with job rules without limitation, but she was mildly limited in her ability to follow detailed instructions, interact appropriately with the public coworkers and supervisors, respond to changes in a work setting, and complete daily activities, and moderately limited in her ability to respond to work pressure was moderately limited due to sadness and low motivation. (AR 492-93.) Dr. Bagner assigned a GAF of 65. (AR 492.)

**D.     Plaintiff's Testimony**

Plaintiff testified at the hearing before the ALJ that she suffers from nerve damage in her back and leg. (AR 43.) She reported that she experiences shooting pain in her back, numbness, tingling, swelling in her feet; and that her knee "goes out" when standing or walking. (AR 40.) Most recently, Plaintiff began suffering from asthma. (AR 38.) Plaintiff's pain medications cause lightheadedness, weakness, and fatigue. (AR 54-55.)

Plaintiff's primary complaint is her mental impairments. She testified that she suffers from depression, anxiety, and irritated and aggressive behavior. (AR 40, 51.) Her irritation is triggered when she is around strangers or in a room with other people. (AR 51-52.) Additionally, Plaintiff suffers from auditory hallucinations that tell her to "try to do something about all of this." (AR 55.)

**E.     ALJ's Findings**

At step one of the sequential evaluation process described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since October 1, 2005, the alleged onset date. (AR 17.) At step two, the ALJ found Plaintiff met the insured status

requirements of the Social Security Act through June 30, 2008, and there was no objective evidence in the record to show severe impairments prior to the date last insured. (*Id*.) Thus, Plaintiff's Title II claim for disability benefits failed at step two. (*Id*.) Regarding Plaintiff's Title XVI claim for supplemental social security benefits, the ALJ found Plaintiff had severe impairments of lumbago/back pain, mood disorder with bipolar and depressive traits, and anxiety. (AR 17-18.) At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 18.)

In the ALJ's RFC assessment between steps three and four, he found Plaintiff could perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c). (AR 19.) Specifically, Plaintiff is limited to frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, and occasionally climb ladders and scaffolds but never ropes. (*Id.*) Plaintiff is limited to simple, routine tasks that do not involve work with quotas or performed at assembly line pace. (*Id.*) Plaintiff is limited to occasional contact with supervisors and co-workers, and no contact with the general public. (*Id.*)

At step four, the ALJ found Plaintiff can perform jobs that exist in significant numbers in the national economy. (AR 25.)

### III.  STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a scintilla, but less than a preponderance. *Id.* Substantial evidence is evidence that a reasonable mind would consider adequate to support a conclusion. *Id.* The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on the grounds that the ALJ did not provide legally sufficient reasons for giving the opinion of Plaintiff's treating physician, Dr. Camacho, little weight. First, Plaintiff contends that contrary to the ALJ's findings, Dr. Camacho's opinion was not inconsistent with his own treatment notes and examination findings. Second, Plaintiff contends that Dr. Bagner's consultative examination was deficient and the ALJ evaluated it erroneously. The Court addresses each assignment of error in turn.

## A.   The ALJ Properly Found Dr. Camacho's Opinion Was Inconsistent with His Own Treatment Notes and Examination Findings.

Plaintiff contends the ALJ erroneously discounted Dr. Camacho's opinions. She argues that Dr. Camacho's opinion was consistent with his own treatment notes and examination findings for two reasons. First, because the ALJ failed to "set forth his own interpretations" and instead simply cited to the entirety of the treatment notes. Second, because the ALJ inaccurately characterized Dr. Camacho's notes by claiming that they show clear speech, logical thought process, and normal perceptions.  Defendant contends the ALJ articulated appropriate reasons for discounting Dr. Camacho's opinion. The Court agrees with Defendant for the reasons set forth below.

### 1.   The ALJ Set Forth His Own Interpretations With Support Through Citations to the Record.

If the ALJ chooses to disregard a treating physician's medical opinion, "he must set forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988) (citations omitted). However, the ALJ is not required, nor should he, pick a single medical opinion and adopt it wholesale. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ is to resolve conflicts in the record and assess the claimant's functionability based on the record as a whole. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041-42 (9th Cir. 2008). If the ALJ chooses to assert that the findings of treating physicians are "unsupported by sufficient

objective findings," he "must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey*, 849 F.2d at 421-22.

Here, Plaintiff cites the rule set forth in *Embrey* and asserts that the ALJ has failed to cite to specific treatment notes, thus "forc[ing] parties to guess as to what treatment notes he referred to." (Doc. No. 17 at 7.) However, the ALJ cited to the treatment notes, and the corresponding dates that demonstrate Dr. Camacho's findings are inconsistent. Specifically, the ALJ articulated the following in his written decision. He noted that in April 2013, Plaintiff was seen by federal prison medical staff complaining of mood instability, and a mental health clinician "performed a mental status exam and found appropriate expression, *normal* rate of speech, and logical thought process." (AR 22 (emphasis in original).)[4] In July 2016, Dr. Camacho evaluated Plaintiff "and found full affect, tangential thought process, perception within normal limits, and euthymic mood." (*Id.*) In July 2016, Dr. Camacho found Plaintiff's "mood was depressed but in full affect, clear speech, logical thought process, and perception within *normal* limits." (*Id.* (emphasis in original)) In February 2017, Dr. Camacho assessed Plaintiff "with bipolar disorder in partial remission." (*Id.*) In June 2017, Dr. Camacho "found logical thought process, clear speech, full affect, and cognition and perception within *normal* limits." (*Id.* (same).) In November 2017, Dr. Camacho assessed Plaintiff "with bipolar disorder in *partial* remission." (*Id.* (same)) The foregoing references show that the ALJ made specific citations to Dr. Camacho's treatment notes and did not, as Plaintiff contends, "force the parties to guess." Therefore, this Court finds that the ALJ set forth specific, legitimate reasons for disregarding the treating physician's medical opinion.

---

[4] Although the ALJ did not cite a report by a federal prison staff psychiatrist, that doctor evaluated Plaintiff in 2013 and deemed her "stable" and found her "psychological stability for custody is judged to be FAVORABLE." (AR 386-88 (emphasis in original).)

Plaintiff also contends that the ALJ did not explain why his interpretations, rather than Dr. Camacho's, are correct. However, the following is just one example of the ALJ's detailed interpretations of the evidence of record and testimony at hearing:

> The claimant is separated from her children as the father has custody and the record shows that her mental stress and anxiety is linked to an ongoing child custody dispute with the children's father. Thus, the record shows the claimant's mental health symptoms are primarily situational and not the result of psychological limitations that prevent her from working. The record shows the claimant is not socially isolated as she alleged at hearing. The claimant has a boyfriend who lives in Los Angeles . . . [she] reported she traveled to Los Angeles four times [in 2017] and six times in 2016. Thus, she has the ability to travel and socialize notwithstanding her assertions at hearing. . . . The claimant reported she prepares simple meals . . . and performs household chores such as laundry and cleaning her room. The claimant reports she is able to pay bills, handle a savings account, and use a checkbook. Finally, the claimant showed the ability to persist and follow through on quitting smoking.

(AR 21 (internal citations omitted).) The ALJ's explanation demonstrates that he carefully considered the entire record, including testimony at the hearing, before making his determination. Therefore, the Court concludes that ALJ set forth his own interpretations and explained why his, rather than the treating physician's, interpretations are correct.

Thus, the Court finds that the ALJ set forth his own interpretations and evidenced them by citations to the record.

## 2. The ALJ Accurately Characterized Dr. Camacho's Treatment Notes.

Plaintiff contends that the ALJ inaccurately characterized Dr. Camacho's treatment notes when the ALJ noted that the notes showed clear speech, logical thought process, and normal perceptions. Plaintiff states that "the treatment notes paint a very different picture," because "[o]ut of nine treatment notes that the ALJ stated had clear speech, logical thought process and normal perceptions only two of them – February 11, 2016 and July 19, 2016, revealed clear speech; logical thought process; and within normal judgment." (Doc. No. 17 at 8.) Thus, Plaintiff claims this is an "inaccurate characterization of the evidence" that warrants remand. (*Id.* citing *Regennitter v. Comm'r*, 166 F.3d 1294, 1297 (9th Cir. 1999).)

The Court finds that the ALJ did not mischaracterize the evidence. Plaintiff cites only nine of Dr. Camacho's treatment notes in her Motion for Summary Judgment and claims they evidence a finding of disability. However, Plaintiff did not address the remainder of Dr. Camacho's notes, nor the additional office visits or counseling sessions with other providers that support a finding of non-disability. Instead, Plaintiff relies on the technicality that clear speech, logical thought process, *and* normal perceptions are not present in every one of the nine treatment notes cited. However, the ALJ need not find all three symptoms present at once to find that Dr. Camacho's opinion was inconsistent. Rather, the ALJ is required to assess a claimant's functional ability based on the record as a whole. *Tommasetti*, 533 F.3d at 1041-42. Here, the record as a whole contains substantial evidence that Dr. Camacho found clear speech, (*see, e.g.*, AR 588, 590, 622, 639, 695, 701); logical thought process, (*see, e.g.*, AR 588, 591, 622, 701); and perceptions within normal limits, (*see, e.g.*, AR 570, 588, 622, 639, 675, 685, 701, 720, 753.) Further, in seven of the notes where Dr. Camacho observed irregular mood, speech, or thought processes, he partially attributed the stress to issues with Plaintiff's ex-husband, her child custody battle, or noncompliance with medication. (AR 622, 635-44, 675, 695, 701-06, 715-24, 748, 752.) The ALJ accordingly opined these mental health symptoms are primarily situational and not the result of psychological limitations that prevent Plaintiff from working. (AR 21.)

### 3. Conclusion

The ALJ did not err in giving Dr. Camacho's opinion little weight. The ALJ set forth specific, legitimate reasons for rejecting Dr. Camacho's finding of disability by detailing inconsistencies between Dr. Camacho's treatment notes and other evidence of record. Further, the ALJ did not inaccurately characterize Dr. Camacho's treatment notes because he assessed the record as a whole and provided specific findings of clear speech, logical thought processes, and normal perceptions. Thus, the ALJ's decision was not based on legal error and was supported by substantial evidence.

**B.    Dr. Bagner's Consultative Examination Findings Are Supported by the Record and Were Properly Evaluated.**

Plaintiff contends that Dr. Ernest Bagner's consultative examination opinion was inadequate. Plaintiff argues, first, that the ALJ utilized Dr. Bagner's "snap shot evaluation" rather than considering the record as a whole. Second, Plaintiff contends Dr. Bagner's examination was insufficient because he did not review Plaintiff's medical records. Third, Plaintiff argues the ALJ only considered one of the six factors set forth in 20 C.F.R. § 416.27(c). Defendant contends the ALJ gave appropriate weight to Dr. Bagner's opinion. The Court agrees with Defendant for the reasons set forth below.

**1.    The ALJ Considered the Record as a Whole and Did Not Rely on a "Snap Shot Examination."**

Plaintiff claims the ALJ improperly relied on Dr. Bagner's "snap shot examination," rather than reviewing the record as a whole. (Doc. No. 17 at 8.) Defendant claims the ALJ did not base his decision wholly on Dr. Bagner's assessment, but he rather based it on the entirety of the evidence, including Dr. Camacho's treatment records and Plaintiff's symptom testimony.

It is an "accepted principle" that a treating physician's opinion is not binding if it is contradicted by substantial evidence, and "the report of a consultative physician may constitute such evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). A consultative doctor's opinion constitutes substantial evidence if it rests on his own independent examination of a patient. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). The Ninth Circuit has upheld findings of non-disability when the ALJ "rest[ed] primarily" on the testimony of a consultative doctor who performed a single neurological examination. *See, e.g.*, *Allen v. Heckler*, 749 F.2d 577, 578 (9th Cir. 1984). While, the consultative physician's opinion may be one piece of substantial evidence, the ALJ must still review the entire record in reaching his or her final opinion. *Tommasetti*, 533 F.3d at 1041-42.

Here, the ALJ gave sufficient reasons for giving Dr. Bagner's opinion substantial weight. Specifically, the ALJ stated that Dr. Bagner was "an accepted medical source who examined the claimant directly [and] his conclusions are consistent with the bulk of the evidence in the record." (AR 23.) The fact that Dr. Bagner conducted a single examination—what Plaintiff labels as a "snap shot"—does not discredit his opinion. Further, the ALJ considered multiple treaters' opinions and testimony at the hearing in reaching his decision. For example, the decision discusses the treatment records of mental health clinician Charito Reyes at the Bureau of Prisons Health Services, (AR 22); unnamed clinicians at Clinicas de Salud del Pueblo, (*id.*); Dr. Camacho at Clinicas de Salud del Pueblo, (AR 23, 24); consultative expert Dr. Bagner, (AR 23); DDS psychological consultant Dr. Tawnya Brode, (AR 24); and Plaintiff's hearing testimony, (AR 19-21). The ALJ then provided a thorough explanation of his findings. Thus, the Court finds there is substantial evidence that the ALJ considered the record as a whole and appropriately gave Dr. Bagner's opinion substantial weight.

2.    **The ALJ Considered Dr. Bagner's Entire Examination, Which is Not Discredited by the Fact that He Did Not Review Plaintiff's Medical Records.**

Plaintiff claims that the ALJ "utilized only two areas of Dr. Bagner's mental status examination–thought process and thought content as a reason to give Dr. Camacho's opinion little weight without looking at [Plaintiff's] mood and speech . . . ." (Doc. No. 17 at 9.) Further, Plaintiff argues that Dr. Bagner's opinion was not based on a complete medical assumption because he did not review Dr. Camacho's records. Defendant responds that "[t]he same could be said for Dr. Camacho's opinion, as there is no indication in the record that Dr. Camacho reviewed Plaintiff's complete medical record and thus, by Plaintiff's own argument, Dr. Camacho would be unable to express an opinion with any degree of medical certainty." (Doc. No. 18 at 23.) The Court finds the ALJ utilized more than two areas of Dr. Bagner's mental status examination, and Dr. Bagner was not required to review Plaintiff's medical records before he reached his opinion.

23

First, Plaintiff's claim that the ALJ only utilized two areas of Dr. Bagner's mental status examination is not supported by the record. The ALJ discussed Dr. Bagner's findings regarding Plaintiff's ability to follow oral and written instruction, ability to interact appropriately with the public and coworkers, and ability to comply with job rules. (AR 23.) Thereafter, the ALJ reconsidered Dr. Bagner's opinion in light of Plaintiff's testimony at the hearing. (*Id*.) The ALJ then contrasted Dr. Bagner's opinion regarding thought processes and thought content with Dr. Camacho's. (AR 23.) These discussions, in total, show the ALJ considered the entirety of Dr. Bagner's opinion while also considering other evidence of record.

Second, Plaintiff cites no case law requiring a consultative doctor to review a claimant's medical records before opining. Conversely, the ALJ may give substantial weight to the opinion of a consultative doctor who obtained a medical history by interviewing the patient. *See Allen*, 749 F.2d at 578. In *Allen*, the ALJ relied heavily on the opinion of a consultative physician (who supported a finding of non-disability), as opposed to the conflicting testimony of the plaintiff's treating physician (who supported a finding of disability). *Id*. The Court noted that the consultative doctor performed a full neurological examination and obtained a medical history through an interview. *Id*. The court found that the consultative doctor's opinion constituted substantial evidence. *Id*. at 580.

Here, Dr. Bagner conducted a complete psychiatric evaluation. He noted that Plaintiff was a "fair and reliable historian" and obtained a history through interview. (AR 489.) Plaintiff gave him a history of her present illness, past psychiatric history, family psychiatric history, medical and surgical history, and family, social, and environmental history. (AR 489-90.) Dr. Bagner's notes from this interview are included in his report prior to his mental status examination findings. (*Id.*) Dr. Bagner did not need to review Plaintiff's medical records to express an opinion with medical certainty; obtaining a medical history through interview was sufficient.

Thus, the Court finds there is substantial evidence that the ALJ utilized the entirety of Dr. Bagner's mental status exam, and his opinion is not discredited by the fact that he did not review Dr. Camacho's treatment notes or opinion.

### 3. The ALJ Applied More Factors Than Just Supportability.

A treating physician's opinion is given "controlling weight" so long as it is not inconsistent with the other substantial evidence of record. *Trevizo*, 871 F.3d at 675. When the opinion is not controlling, it is weighted according to the factors set forth in 20 C.F.R. § 416.927(c)(1)-(6), such as the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, specialization of the physician, and other factors. *Id.*

Plaintiff claims the ALJ only applied one of the six factors set forth in section 416.927—supportability—in determining the extent to which Dr. Camacho's opinion should be credited. Defendant claims the law does not require the ALJ to discuss each regulatory factor and explain how it supports the decision. Rather, Defendant contends the law requires the ALJ only to consider the factors and provide specific and legitimate reasons for rejecting a treating physician's opinion, which the ALJ did. (Doc. No. 18 at 24 (citing *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017)).) The Court agrees with Defendant.

Here, the language of the ALJ's discussion supports a finding that he considered the six factors in reaching his decision. Plaintiff admits that the ALJ considered the supportability of Dr. Camacho's opinion. There is substantial evidence the ALJ considered the frequency of examination and the nature and extent of the treatment relationship. The ALJ articulated the dates of Dr. Camacho's treatment notes in his decision, which began in 2016. (AR 22.) Thereafter, he notes the frequency in which Plaintiff visited Dr. Camacho, and his status as Plaintiff's treating physician. (*Id.*) There is substantial evidence the ALJ considered consistency with the record. In his written decision, the ALJ compared Dr. Camacho's finding with Dr. Bagner's observation that "low motivation may be a material issue," testimony at the hearing that Plaintiff travels to Los Angeles to visit her

boyfriend, and Dr. Camacho's own treatment notes that state that her ongoing mental stress and anxiety is linked to an ongoing child custody dispute. (*Id.*) The ALJ specifically stated that "Dr. Camacho's conclusions are not consistent with the findings of psychological CE Ernest Bagner." (AR 24.) Further, in Plaintiff's own brief, she states that the ALJ discounted Dr. Camacho's opinion because it was inconsistent with his own treatment records and inconsistent with Dr. Bagner's findings. Moreover, there is substantial evidence the ALJ considered Dr. Camacho's specialization. The ALJ noted that Plaintiff presented to Clinicas de Salud del Pueblo specifically seeking mental health treatment, not primary care. (AR 23.) The ALJ later notes that Dr. Bagner is a psychological[5] consulting examiner, implicitly contrasting this with Dr. Camacho's status as a treating psychiatrist.

Finally, the ALJ need not address each factor in turn in his written decision. Rather, the ALJ is required to consider each factor in reaching his decision and may only reject it for clear and convincing reasons supported by substantial evidence. *Trevizo*, 871 F.3d at 675. This Court concludes there is substantial evidence that the ALJ considered more factors than only "supportability" in reaching his decision.

### 4. Conclusion

The ALJ did not err in giving Dr. Bagner's opinion substantial weight. The Ninth Circuit has held that a consultative doctor's examination may be considered substantial evidence even when a history is obtained through interview. Further, it is clear from the written decision the ALJ considered more than just the supportability of Dr. Camacho's opinion. Thus, the ALJ's decision was not based on legal error and was supported by substantial evidence.

## C. Plaintiff is Not Entitled to Summary Judgment.

Based on the foregoing, the Court recommends that Defendant's MSJ be GRANTED. This Court necessarily recommends that Plaintiff's MSJ be DENIED.

---

[5] Although the ALJ refers to Dr. Bagner as a psychological consulting examiner, it should be noted that Dr. Bagner is a psychiatrist, not a psychologist.

## V.     CONCLUSION

This Court RECOMMENDS that Plaintiff's MSJ be DENIED and that Defendant's Cross-MSJ be GRANTED.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that **no later than May 1, 2020**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties **no later than May 22, 2020**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: April 2, 2020

Hon. William V. Gallo
United States Magistrate Judge

19-CV-555-LAB(WVG)